# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | |
|---|---|
| BOYD LEWIS, ) | |
| ) | Case No. 1:18-cv-127 |
| *Plaintiff*, ) | |
| ) | Judge Travis R. McDonough |
| v. ) | |
| ) | Magistrate Judge Christopher H. Steger |
| UNUM LIFE INSURANCE COMPANY ) | |
| OF AMERICA, ) | |
| ) | |
| *Defendant*. | |

## MEMORANDUM AND ORDER

In this action, Plaintiff Boyd Lewis seeks judicial review of Defendant Unum Life Insurance Company's ("Unum") decision to deny his claim for long-term disability ("LTD") benefits under an employer-sponsored disability plan pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 101 *et seq.* ("ERISA"). Lewis alleges that Unum acted arbitrarily and capriciously in determining that he was not eligible for benefits under the policy.

Both Lewis and Unum have moved for judgment on the administrative record.[1] (Docs. 21, 23.) For the following reasons, Lewis's motion for judgment on the administrative record (Doc. 21) will be **DENIED** and Unum's motion for judgment on the administrative record (Doc. 23) will be **GRANTED**.

---

[1] Though Lewis submitted this motion as a motion for summary judgment, Lewis's motion is more accurately characterized as a motion for judgment on the administrative record. *See Buchanan v. Aetna Life. Ins. Co.*, 179 F. App'x 304, 306 (6th Cir. 2006) ("Traditional summary judgment concepts are inapposite to the adjudication of an ERISA action for benefits . . . because the district court is limited to the evidence before the administrator at the time of its decision.").

## I. BACKGROUND

Lewis began his employment with Zycron Computer Services, Inc. ("Zycron") on September 12, 2011, where he worked as an IT Infrastructure Administrator. (Doc. 15-1, at 55.)[2] As a Zycron employee, Lewis was eligible for both short-term and long-term disability benefits under a policy issued by Unum (the "Policy") through Zycron. Lewis's employment with Zycron ended on August 26, 2015, but, for purposes of his LTD benefits claim, Lewis claims he became disabled on September 4, 2015. (Doc. 15-1, at 61.)

Under the Policy, a person is "disabled" when Unum determines:

(1) You are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and

(2) You have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

(Doc. 15-1, at 129) (emphasis in original). The policy defines material and substantial duties as "duties that: are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified." (*Id.* at 143.) Finally, "regular occupation" is defined as "the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the works tasks are performed for a specific employer or at a specific location."[3] (*Id.* at 145.)

---

[2] There was some confusion over the citation of the record in the briefing. When the Court cites a page number, it will be citing to the document ID which is located at the bottom center of the page on ECF. Lewis's brief cited to the page number of the document in the PDF file, which is often obscured on ECF.

[3] Unum, in its briefing, points out that there is another definition of disability that it could have used, the "any gainful occupation" standard. As Unum notes, it did not analyze the claim under this "more stringent" standard. Thus, it is irrelevant in determining whether the insurer's actions were arbitrary and capricious. *See Smith v. Grp. Short Term Disability & Long Term Disability Plan for Emps. of Walmart*, No. 1:07-cv-139, 2008 WL 2278665 at *5 (E.D. Tenn. May 30, 2008).

2

Additionally, Unum is granted "discretionary authority to make benefit determinations under the plan." (*Id.* at 149.) These determinations "include determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the plan." (*Id.*) Under the Policy, Unum also had the right to "require [Lewis] to be examined by a physician." (*Id.* at 129.)

In August 2015, Lewis was involved in a four-wheeler accident. (Doc. 15-1, at 223.) The day after the accident, he reported to Erlanger Medical Center. (*Id.*) The notes from the attending physician indicate that Lewis was suffering from chest pain and palpitations. (*Id.*) The attending physician noted that Lewis was in supraventricular tachycardia, meaning that he had an abnormally accelerated heartrate, and indicated that he reported feeling weak and experiencing occasional presyncopal episodes. (*Id.* at 224–227, 272, 280.) Lewis's cardiac work-up proved to be negative, though he continued to experience episodes of palpitations and tachycardia. (*Id.* at 255.)

Lewis has since been seen by many doctors and other medical professionals. These include Ms. Jennie Phillips, a Physician Assistant ("PA") who acts as Lewis's primary care doctor; Dr. David Huffman, an endocrinologist; Dr. Ondrej Lisy, a cardiologist; Dr. Nathan Wyatt, a neurologist; and Dr. Timothy Callahan, a specialist in tickborne disease. According to his medical records, Lewis's most consistent complaints are chest pain, fatigue, and tachycardia events, during which his heartrate can rise above 210 beats per minute. (Doc. 15-1, at 224.) Lewis also claims that he will lose consciousness, have seizure-like events, and experience tremors in his hands if he is sexually abstinent. (*Id.* at 354.)

Dr. Lisy, his cardiologist, reported that Lewis complained of regular episodes of heart palpitations, feeling weak, and presyncopal episodes. (Doc. 15-1, at 303.) In November of

3

2016, Dr. Lisy wrote to Unum stating, "I do not see any cardiac limitations for his job as [sic] information technologist at the present time." (*Id.* at 683.) Dr. Huffman, Lewis's endocrinologist, similarly stated, "I am not restricting [Lewis] from an endocrine standpoint." (*Id.* at 674.) Lewis does not challenge the conclusions of Dr. Huffman or Dr. Lisy that "there were no physical limitations from a cardiac or endocrine standpoint." (Doc. 22, at 6.)

Lewis also saw Dr. Wyatt, a neurologist. Dr. Wyatt, like the doctors before him, could not diagnose Lewis with any medical condition. (Doc. 15-1, at 813.) Dr. Wyatt examined an MRI of Lewis's spinal cord, but he found no evidence that Lewis's accident with the four-wheeler caused a spinal-cord injury that would result in his symptoms. (*Id.* at 355.) Dr. Wyatt represented to Unum that "[Lewis] does not appear to have a neurological disease occurring." (*Id.* at 813.) Dr. Wyatt, however, also told Unum that Lewis was not supposed to drive a car. (*Id.* at 824.)

Lewis also repeatedly saw Dr. Callaghan, a tickborne disease specialist located in Tunica, Mississippi. (Doc. 15-2, at 1000.) Dr. Callaghan diagnosed Lewis with Lyme Disease. (*Id.* at 1065.) Thus, Dr. Callaghan was the only doctor to diagnose Lewis with any underlying medical condition. Dr. Callaghan tested Lewis for Lyme Disease three times. (*Id*. at 975–78.) One test was inconclusive, and the other two were negative. (*Id.*) Nevertheless, Dr. Callaghan still believed that Lewis had Lyme Disease and placed him on a course of antibiotic therapy. (*Id.* at 1084.) Lewis took the antibiotics for more than nine months with no improvement of his symptoms. (*Id.* at 1527.) At all times relevant to this litigation, Dr. Callaghan has maintained that Lewis is too sick to work due to a tickborne disease. Dr. Callaghan has stated that "I feel he cannot lift more than 5 lbs. of weight and should not be driving except to the doctor and for essentials such as food/shopping. I don't think he can work at any job at all right now." (*Id.* at

4

1065.)

Lewis was granted short term disability benefits by Unum, and he was originally granted LTD benefits when Unum first analyzed the claim. (Doc. 15-1, at 404–06.) From May 27, 2016, through August 9, 2017, Unum made payments to Lewis for LTD. (*Id.*) On August 9, 2017, however, Unum informed Lewis that his claim for LTD had been denied. (Doc 15-2, at 1035.) Unum recommended a company that would argue on behalf of Lewis for Social Security Disability Insurance ("SSDI"). (Doc. 15-1, at 476–86, 490.) The company argued to the Social Security Administration that Lewis was disabled and completely unable to work. (*Id.* at 801–02.) Lewis's claim for SSDI was ultimately unsuccessful. (*Id.* at 801–02; Doc. 15-2, at 1526.)

Unum provided several reasons for initially denying Lewis's claim. (Doc 15-2, 1035–39). First, Unum defined what occupation Lewis had in the national economy. Its occupational analysis determined that Lewis was an IT Technician under the Enhanced Dictionary of Occupational Titles. (*Id*. at 992.) The description stated that the job was light work, which meant that the physical demands were "exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or negligible amount of force constantly to move objects. Frequent reaching, fingering. Occasional standing, walking, sitting, and handling." (*Id.* at 993.) Unum determined that Lewis could work that job, relying on the analysis of two consulting physicians who both stated that they could find no evidence that Lewis was unable work. (*Id.* at 1037.) It noted that every doctor besides Dr. Callaghan had been unable to diagnose Lewis. (*Id.* at 1036.) One of Unum's reviewers, Dr. Bress, found Lewis's diagnosis inconsistent with the conclusion that "the claimant is able to travel from Tennessee where he lives to Mississippi to see DR Callaghan which is consistent with the ability to sit and/or drive for extended periods of time." (*Id.* at 1030.) Unum further noted that "there had been no documented abnormal exam

5

findings," which led them to conclude "there is no evidence in the medical records of [a] physical or cognitive deficit that would prevent you from performing the duties of your regular occupation." (*Id.* at 1036.)

Lewis appealed Unum's denial of long-term disability benefits. (Doc. 15-2, at 1140.) In support of his appeal, Lewis relied on: (1) pictures of himself enjoying his previously active lifestyle; (2) a letter from Ms. Phillips, the PA, which stated that she concurred in the opinion of Dr. Callaghan that Lewis should not work; (3) a letter from Dr. Callaghan which restated his opinion that Lewis was unable to work due to tickborne disease; and (4) a letter he wrote rebutting Unum's findings as to denial of long-term disability benefits. (*Id.* at 1140–64.)

In his letter, Lewis asserted that Unum's conclusion—that his stated inability to work was inconsistent with his trips to see Dr. Callaghan in Mississippi—was wrong. (*Id.* at 1141.) He stated that "I have been suffering through these doctors visit[s] . . . enduring these doctors appointments means stopping multiple times every trip to endure heart episodes and near syncope for hours, then get to a hotel room where I recover from the pain of the heart and the stressful trip until the Dr apt next day. This is a painful and stressful trip." (*Id.*) Lewis also raised the argument that his job was misclassified as he often had to lift up to 60-80 pounds at his previous work. (*Id.*) The letter from Dr. Callaghan stated that Lewis had a tickborne disease. (*Id.* at 1147.) Dr. Callaghan opined that Lewis could not lift over five pounds and that he should not be driving. (*Id.*) The doctor admitted that antibiotics had been ineffective so far, and that his test results failed to show Lyme Disease based on the CDC criteria. (*Id.*) Dr. Callaghan, however, remained confident that Lewis suffered from a tickborne disease. In her letter, Ms. Phillips, PA stated that she was "at a bit of a loss as to how to guide [Unum] in [Lewis's] disability claim" as the lack of a diagnosis meant she had to "defer to his Lymes [sic] specialist

6

on any restrictions." (*Id*. at 1163.)

In response to the appeal, Unum asked another analyst to classify Lewis's position in the national economy and retained another consulting physician to review Lewis's medical records. (Doc. 15-2, at 1245, 1525.) The analysist did not find any reason to revisit or revise Lewis's job classification in the national economy. (*Id.* at 1245.) Dr. Bartlett, the final doctor who performed a file review for Unum, also found that Lewis was able to return to work. (*Id.* at 1525–30.) Dr. Bartlett also relied on the fact that Lewis went to Mississippi to see Dr. Callaghan. (*Id.* at 1529.) He concluded that Lewis was driving to Mississippi because Lewis said, "I have made trips to see my Lyme Doctor in MS and takes a long time, stopping when tachycardia starting. I usually get a hotel during the trip because the episodes are so bad. It is dangerous but I am doing the best I can. . .." (*Id.*)

Dr. Bartlett also disagreed with Dr. Callaghan's diagnosis of Lyme Disease. (Doc 15-2, at 1527.) He focused on the negative test results and the lack of improvement once Lewis was given antibiotics. (*Id.*) He also noted that Dr. Callaghan described Lewis as having "bizarre" symptoms. (*Id.*) Dr. Bartlett also questioned Dr. Callaghan's credibility by noting that his treatments, which included anti-parasitics, IV stem-cells, and turning off the Wi-Fi at night were not proven or reliable methods to combat any tickborne illness. (*Id.*)

In its letter rejecting the appeal, Unum relied extensively on Dr. Bartlett's report. (Doc. 15-2, at 1540–41.) It also relied on records obtained from another doctor, Dr. Cornea, whom Lewis has visited. (*Id.* at 1541.) Dr. Cornea encouraged Lewis to stop taking the medicines Dr. Callaghan prescribed to him. (*Id.*) Unum also highlighted what it considered to be inconsistencies in Lewis's behavior such as his hang-gliding the day after the four-wheeler accident and his driving to Mississippi. (*Id.* at 1542–43.) Thus, besides questioning the

7

diagnosis alone, Unum challenged Lewis's credibility.  Based on these facts, Unum rejected Lewis's appeal.  (*Id.* at 1540.)

## II. STANDARD OF REVIEW

Under ERISA, when a policy contains a clear and express grant of discretion to the administrator of the policy, the court will not overturn the administrator's decision unless that decision is arbitrary and capricious.  *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  The policy Unum issued contains such a grant of discretion, and both parties agree that the arbitrary-and-capricious standard applies to this case.  (Doc. 22, at 10; Doc. 23, at 13).

Under the arbitrary-and-capricious standard, the administrator's decision must stand "if it is 'the result of a deliberate principled reasoning process' and 'supported by substantial evidence.'"  *Shaw v. AT&T Ben. Umbrella Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015) (quoting *DeLisle v. Sun Life Assur. Co. of Can.*, 558 F.3d 330, 444 (6th Cir. 2009)).  In short, if the administrator can offer a reasonable explanation as to its decision, the decision is not arbitrary and capricious.  *Id.*  The Court, however, is not required to blindly accept the decision of an administrator.  "[A]rbitrary-and-capricious review is not a rubber stamp." *Id.* (quotation marks omitted) (quoting *Cox v. Standard Ins. Co*., 585 F.3d 295, 302 (6th Cir. 2009)).  Instead, the Sixth Circuit has outlined several factors to consider:

> "[T]he quality and quantity of the medical evidence"; the existence of any conflicts of interest; whether the administrator considered any disability finding by the Social Security Administration; and whether the administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant.

*Fura v. Fed. Exp. Corp. Long Term Disability Plan*, 534 F. App'x. 340, 342 (6th Cir. 2013) (quoting *Bennet v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552–53 (6th Cir. 2008)); *see also Shaw*, 795 F.3d at 547 (discussing same factors).  Furthermore, in analyzing Unum's decision,

8

the court is limited to the facts "known to the plan administrator at the time he made his decision." *Yeager*, 88 F.3d at 380.

### III. Analysis

Lewis argues that Unum's denial of long-term disability benefits was arbitrary and capricious because Unum: (1) had a conflict of interest; (2) unreasonably ignored the opinions of his treating physicians; and (3) misclassified his work in order to determine he was able to work. The Court will address these arguments in turn.

#### A. Conflict of Interest

Unum has a conflict of interest due to its position as the administrator and payor of the policy in question. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112–15 (2008). Unum does not dispute that this conflict exists, only what weight it should be given in determining whether Unum's decision was arbitrary and capricious. (Doc. 23, at 22–23.)

The existence of a conflict of interest does not render a decision arbitrary and capricious. *Collins v. Unum Life Ins. Co.*, 682 F. App'x 381, 387 (6th Cir. 2017); *see also Cultrona v. Nationwide Life Ins. Co.*, 748 F.3d 698, 704 (6th Cir. 2014) ("[A] conflict of interest, standing alone, does not require reversal."). A conflict of interest is "simply another factor in evaluating the quality of [the plan administrator's] decision-making process." *Cultrona*, 748 F.3d at 704.

Courts also consider insurance companies' representations to the Social Security Administration when determining how much weight to give a conflict of interest. *Metro. Life Ins.*, 554 U.S. at 118. Lewis argues that "[t]he Defendant should be estopped from arguing that Lewis is not disabled" because Unum helped Lewis file for Social Security Disability Benefits. (Doc. 22, at 3 n.2.) While Unum's assistance to Lewis in filing for Social Security Disability Benefits is relevant, it falls far short of requiring estoppel. *Metro. Life Ins.*, 554 U.S. at 118

9

(explaining it was proper for the Court of Appeals to focus on the fact that "MetLife had encouraged [the plaintiff] to argue to the Social Security Administration that she could do no work"). The company's assistance, however, "justif[ies] the court in giving more weight to conflict."[4] *Id.* Because there was a conflict of interest, this factor weighs in Lewis's favor.

### B. Unum's Review of Medical Files

Lewis next argues that Unum's denial of benefits was arbitrary and capricious because Unum disregarded the opinions of Lewis's treating medical providers, most notably Dr. Callaghan and Ms. Phillips, PA. Many ERISA cases have conflicting medical opinions, and the administrator's decision "to rely upon the medical opinion of one doctor over that of another" does not render the decision arbitrary and capricious. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 170 (6th Cir. 2003). "[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). Yet, a plan administrator cannot "arbitrarily refuse to credit a claimant's reliable evidence." *Id.* at 834. In other words, a rejection of another doctor's medical opinion cannot be done summarily; the plan administrator must "give reasons for adopting an alternative opinion." *Shaw*, 795 F.3d at 548–49.

In this case, it was reasonable for Unum to rely upon the opinions of its medical consultants instead of the opinions of Dr. Callaghan and Ms. Phillips, PA. Ms. Phillips stated that she relied upon or would defer to the opinion of Dr. Callaghan. (Doc. 15-2, at 1163.) Therefore, if Unum had reasons to dispute Dr. Callaghan's findings, then Ms. Phillips's opinion would fare no better. (*Id.*) Dr. Callaghan stated that Lewis was unable to work due to a

---

[4] SSA's finding that Lewis was not disabled is also relevant as Unum was not required to respond to SSA's conclusion. *Shaw*, 795 F.3d at 547 (discussing that a failure to consider a finding by the SSA may make a decision arbitrary and capricious).

diagnosis of Lyme Disease. Dr. Bartlett, Unum's file reviewer, opined that Callaghan's opinion was not credible because: (1) Lewis's test results for Lyme Disease "[did] not support a diagnosis of Lyme disease by CDC criteria;" (2) after treatment for Lyme Disease there had been no improvement in the patient's symptoms; (3) Lewis experienced, according to Dr. Callaghan, "abrupt" and "bizarre" symptoms, and (4) another one of Lewis's doctors instructed him to not take any Lyme Disease medication. (*Id.* at 1526–27.) The plan administrator formally outlined these reasons in a letter rejecting Lewis's appeal. (*Id.* at 1542.) Because there was objective evidence that rebutted Dr. Callaghan's conclusion, Unum could reasonably choose to discredit his opinions.

Additionally, Unum's failure to order a physical examination, while a factor to consider in determining whether its decision was arbitrary and capricious, is not enough alone to conclude that its decision was unreasonable. The Sixth Circuit has been clear that there is no rule as to when a plan administrator must order a physical examination. *Calvert v. Firstar*, 409 F.3d 286, 295 (2005); *Judge v. Metro. Life Ins.*, 710 F.3d 651, 663 (6th Cir. 2013). Instead, the Sixth Circuit has stated that a file review may be discredited if "the file reviewer concludes that the claimant is not credible without having actually examined him or her" or "the plan administrator, without any reasoning, credits the file reviewer's opinion over that of a treating physician." *Judge*, 710 F.3d at 663 (citing *Bennett*, 514 F.3d at 555). The Sixth Circuit, however, has not held that questioning a claimant's credibility alone is sufficient to render a decision arbitrary and capricious. Instead the reviewer's determination must contradict the available objective evidence. *See Bennett*, 514 F.3d at 555 (discrediting a file review after the reviewer contradicted his own conclusions, ignored record evidence, and determined the plaintiff was not credible with no physical examination.) Therefore, a file review is appropriate when the reviewer reasonably

11

relies on the available objective evidence and that evidence itself is credible.

Unum clearly placed Lewis's credibility into issue, and a physical examination would have been reasonable. But such an examination is not required, because available objective evidence from Lewis's own treating physician directly undercuts his claimed long-term disability. Unlike *Calvert*, Unum did not ignore *objective* evidence. 409 F.3d at 296 (finding insurer ignored abnormalities reported on a CT scan when analyzing complaints of pain). And, unlike *Shaw*, there is no reason to believe that Lewis's claimed disability was "not easily subject to objective verification." 795 F.3d at 550. In this case, Lewis has produced no objective evidence that he suffers from Lyme Disease. To the contrary, Lewis tested negative for Lyme Disease twice. (Doc. 15-2, at 975–78.) Dr. Bartlett's conclusions were also well supported by reference to objective evidence. (*Id.* at 1526–27.) *Contra Bennett*, 514 F.3d at 555 (holding a file review was insufficient when the reviewer contradicted his own objective evidence). Unum relied on the available objective evidence. While a physical examination would be necessary if Unum wished to contradict Lewis's subjective complaints, it was not necessary to contradict the diagnosis of Lyme Disease.

Unum, furthermore, did more than just rely on its own doctors; it relied on Lewis's doctors. The majority of Lewis's doctors concluded that he was able to work.[5] While Dr. Callaghan diagnosed Lewis with Lyme Disease, Unum's decision to deny benefits was not arbitrary and capricious given Dr. Callaghan's findings and Lewis's treatment history. Unum provided a thorough list of reasons for its rejection of the diagnosis, and most of those reasons did not require an in-person examination. Far from "arbitrarily refus[ing] to credit a claimant's

---

[5] Dr. Lisy and Dr. Huffman found that there should be no restrictions on the Lewis's ability to work. (Doc 15-1, at 674, 683.) Dr. Wyatt concluded only that Lewis should not drive, but he did not indicate a diagnosis or any other restrictions. (*Id.* at 813, 824.)

12

reliable evidence," *Black & Decker Disability Plan*, 538 U.S. at 825, Unum reasonably concluded that Dr. Callaghan's opinion and diagnosis were not credible.

### C. Lewis's Work Classification

Lewis's final contention is that the Unum misclassified his work, and in doing so Unum's review was arbitrary and capricious. More specifically, Lewis claims that he is required to drive for his job, and his doctor's orders preclude him from doing so. (Doc. 22, at 13.) Lewis errs in this argument for two reasons. First, while the Lewis's job required a good deal of driving, Unum was not required to analyze Lewis's specific job. Second, the characterization of Lewis's job given by the insurance company was reasonable and did not require driving.

The requirements of Lewis's specific work are not relevant to the Court's review. The Court is bound by the terms of the Policy. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). ("[T]he validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue.") The Policy clearly states that in determining disability, "Unum will look at your occupation as it is normally performed in the national economy, *instead of how the works tasks are performed for a specific employer or at a specific location*." (Doc. 15-1, at 145) (emphasis added).[6] The fact that Lewis had to travel for his job is uncontested, but the Policy, in clear and unambiguous terms, stated that Unum would not examine Lewis's specific job. (*Id.*) Thus, Unum's decision to not examine Lewis's work is not arbitrary and capricious. Furthermore, because Unum was not required to look at Lewis's specific job, its decision regarding Lewis's ability to drive is irrelevant.

Lewis also argues that on a national scale Unum mischaracterized Lewis's work. Lewis

---

[6] The fact that this clearly does not apply to Lewis's specific job becomes obvious when compared to a different policy. For example, the policy in *Judge* stated that it would apply when "*you* are never expected again to be able to do *your* job." 710 F.3d at 654 (emphasis added).

13

claims that the "occupation number identified by Unum does not even exist in the [Dictionary of Occupational Titles ("DOT.")]" (Doc. 22, at 14.) This argument is unpersuasive. According to the record, although Unum consulted with the DOT, it also examined other sources. (Doc. 15-2, at 1245). Unum used the Enhanced Dictionary of Occupational Titles, a separate source run by the Economic Research Institute. (*Id.*) Lewis is correct that the occupation number Unum cites is not in the DOT, but Unum did not cite the DOT for its research.[7] Lewis has presented no basis to conclude that Unum's decision was unreasonable. *Conkright v. Frommert*, 556 U.S. 506, 512 (2010) (holding that when an insurer is given the power to construe the terms, as it was here, its "interpretation will not be disturbed if reasonable.") Therefore, Unum's analysis of Lewis's occupation was not arbitrary and capricious.

## IV. CONCLUSION

Unum was required only to reasonably interpret its policy and to provide reasoned explanations for its conclusions. It has done so in this case. Therefore, Unum's denial of long-term benefits was not arbitrary and capricious. For the reasons set forth, Lewis's motion for judgment on the administrative record (Doc. 21) is **DENIED**. Unum's motion for judgment on the administrative record (Doc. 23) is **GRANTED**.

**AN APPROPRIATE JUDGMENT WILL ENTER.**

---

[7] Lewis further argues that the Court should adopt an alternative definition of Lewis's work on a national level, namely Data Communication Technician. (Doc. 22, at 14); *See* Dictionary of Occupational Titles (4th ed. 1991), https://www.dol.gov/agencies/oali/PUBLIC/DOT/-REFERENCES/DOT08B (providing definition). The definition here is not relevant because Unum did not rely on it. *Yeager*, 88 F.3d at 380. Even if it were relevant, it would not support Lewis's contentions. First, the definition does not state that driving is required. Second, while the definition classifies the work as medium work instead of light work, the change in activity level Lewis is expected to maintain is not relevant. The only doctor to conclude anything about a physical limitation is Dr. Callaghan, who made a diagnosis that Unum chose not to accept. Therefore, the alternative definition offered by Lewis provides no reason to disturb Unum's reasonable conclusion.

14

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**